### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **PERFORMANCEPARTNERS LLC,** | **Case No. 1:23-cv-** 721 |
| Plaintiff | |
| v. | **JURY TRIAL DEMANDED** |
| **PARKING SYSTEMS OF AMERICA I, L.P.,** | |
| Defendant | |

### ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

PerformancePartners LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Defendant Parking Systems of America I, L.P. ("PSA" or "Defendant"), and alleges, upon information and belief, as follows:

### THE PARTIES

1.      PerformancePartners LLC is a domestic limited partnership organized and existing under the laws of the State of Texas with its principal place of business at 119 West Ferguson, Tyler, Texas 75702.

2.      Upon information and belief, Defendant is a foreign for-profit corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 4011 Commerce Street, Dallas TX 75226.  Defendant may be served through its registered agent in the State of Texas as follows: Mr. Thad F. Baker, at 4011 Commerce Street, Dallas TX 75226.  On information and belief, PSA owns, operates, or otherwise controls the certain parking facilities and/or toll facilities (individually and collectively herein as the "Facility"), including but not limited to the means and methods of ingress and egress thereto.  On information and belief, such means and

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                1

methods are offered and provided to consumers throughout the State of Texas, including in this judicial District.  In the alternative, PSA maintains a business location within this judicial District. On information and belief, PSA specifically targets customers in the State of Texas and in this judicial District, including because the Facility and/or the business location of PSA is physically located in the State of Texas and in this judicial District.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

4.      This Court has personal jurisdiction over Defendant.  Defendant has continuous and systematic business contacts with the State of Texas.  Defendant directly conducts business extensively throughout the State of Texas by owning, operating, or otherwise controlling the Facility and the means and methods of ingress and egress thereto.  Defendant has purposefully and voluntarily made its services, including the infringing systems and methods, available to residents of this District and into the stream of commerce with the intention and expectation that they will be used by consumers in this District.

5.      On information and belief, Defendant maintains physical brick-and-mortar business locations in the State of Texas and within this District, retains employees specifically in this District for the purpose of servicing customers in this District (including at the Facility), and generates substantial revenues from its business activities in this District.  Further on information and belief, Defendant employs specific individuals to serve as "City Managers" in specific geographic locations (including Austin and San Antonio, Texas), and specifically requires such individuals to reside within those geographic locations in order to serve clients for the benefit of Defendant.



*See https://parkingsystemsofamerica.com/contact-us/austin/*

*See https://parkingsystemsofamerica.com/contact-us/san-antonio/*

6.      On information and belief, PSA maintains ownership, management, and/or control over the

Facility, including but not limited to the means of ingress and egress thereto.  In addition and/or in

the alternative, PSA manages the performance of the infringing functionalities directly or

otherwise through agents specifically authorized to manage such infringing functionalities on

behalf of PSA.  In addition and/or in the alternative, PSA provides the hardware and software

which collectively directly perform the infringing functionalities.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                          3

7.      Venue is proper in the Western District of Texas as to Defendant pursuant to at least 28 U.S.C. §§ 1391(c)(2) and 1400(b).  As noted above, Defendant maintains a regular and established business presence in this District.

## **PATENTS-IN-SUIT**

8.      Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent No. 7,525,435 (hereinafter "the Performance Partners Patent" or "the '435 Patent").

9.      By operation of law, the Performance Partners Patent was originally issued and exclusively vested to the sole named inventor, C. Joseph Rickrode, as of the date of issuance on April 28, 2009.  *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.,* 959 F.3d 1065, 1072 (Fed. Cir. 2020); *Suppes v. Katti,* 710 Fed. Appx. 883, 887 (Fed. Cir. 2017); *Taylor v. Taylor Made Plastics, Inc.,* 565 Fed. Appx. 888, 889 (Fed. Cir. 2014).  Mr. Rickrode, in a written instrument dated February 2, 2009, and filed with the United States Patent and Trademark Office on February 3, 2009 at Reel 022193 and Frames 0548-0550, assigned all rights, title, and interest in the Performance Partners Patent to Performance Partners LLC (of New Hampshire).  Thereafter, in a written instrument dated February 11, 2023, Performance Partners LLC (of New Hampshire) assigned all rights, title, and interest in the Performance Partners Patent to the Plaintiff, PerformancePartners LLC (of Texas).  The aforementioned assignment was filed with the United States Patent and Trademark Office on February 12, 2023 at Reel 062667 and Frames 0221-0224.  As such, Plaintiff PerformancePartners LLC has sole and exclusive standing to assert the Performance Partners Patent and to bring these causes of action.

10.     The Performance Partners Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

11.     The inventions described and claimed in the Performance Partners Patent were invented individually and independently by C. Joseph Rickrode.

12.     The Performance Partners Patent includes numerous claims defining distinct inventions.

13.     The priority date of the Performance Partners Patent is at least as early as August 2, 2005.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.

14.     The '435 Patent relates generally to methods and systems for securing, protecting, and controlling defined areas by managing access points for entering and exiting vehicles or mobile entities, and matching entering vehicle or mobile entity identification information with exiting identification information.  *See* Abstract, '435 Patent.

15.     As noted, the claims of the Performance Partners Patent have priority to at least August 2, 2005 (the "Date of Invention").  At that time, the practice of cashless tolling or parking using Automatic Number Plate Recognition ("ANPR") to achieve the advantages of the inventions claimed in the '435 Patent was still many years away.  For example, as of the Date of Invention, the conventional technology for managing access points for entering and exiting vehicles was embodied in physical cards carried by the driver or passenger, as cited and argued by the Patent Examiner during prosecution of the '435 Patent.  Otherwise, and further as of the Date of Invention, the alternative conventional technology for managing access points for entering and exiting vehicles was limited to Radio Frequency Identification ("RFID") tags located in such vehicles.  Of course, such RFID technologies were dependent upon a physical transponder and were incapable of obtaining electronically readable unique repeatable distinguishing characteristics of entering/exiting vehicles (such as reading the license plate) in accordance with the inventions as claimed in the '435 Patent.  Only many years later, in or around 2012, did the use of ANPR to obtain distinguishing vehicle

characteristics become available and begin to approach conventionality in the field.  As such, the technological solutions of the Performance Partners Patent were not well-understood, routine, or conventional as of August 2005.

16.     As noted, the claims of the Performance Partners Patent have priority to at least August 2, 2005. The deficiencies in the state of the art as of the Date of Invention were highly problematic, inasmuch as facility operators routinely lost millions of dollars to drivers who would readily avoid payment by simply removing the physical transponder from the vehicle or by driving without one altogether.  The inventions as claimed in the '435 Patent overcame the deficiencies in the art by offering the unconventional approach of incorporating technology for obtaining vehicle characteristics upon entry and exit, thus allowing substantial economic benefits to facility operators.  As such, the technological solutions of the Performance Partners Patent were not well-understood, routine, or conventional as of August 2005, and provided greatly improved system performance over the state of the art.

17.     The claims of the Performance Partners Patent are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Performance Partners Patent are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements and steps, as recited in the claims, were not conventional or routine as of the Date of Invention.

18.     Further, the claims of the Performance Partners Patent contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

19.     Consequently, the claims of the Performance Partners Patent recite methods resulting in improved functionality of the systems on which they are performed and represent technological improvements to the operation of computers as tools of trade.  The claims of the '435 Patent provide for, *inter alia*, at least the following benefits over the conventional art: (i) protecting,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                        6

controlling and securing a region entered and exited by vehicles; (ii) identifying, relating, rejecting or accepting an entering vehicle as a vehicle with no potential problem as the vehicle enters into a protected or protectable area or region; (iii) providing means and method for obtaining vehicle identification information for an exiting vehicle and comparing such exiting vehicle identification with the vehicle identification of entering vehicles for a matching review of stored data thereby allowing exit of the vehicle based upon the finding of a matching identification, or not allowing the exit of the vehicle if no matching is found in the stored data base; (iv) providing means and methods for comparison and review of the obtained identification information of the entering vehicle with stored information; and (v) creating a suitable "characteristics identity" for a given vehicle by detection of select characteristics of the vehicle such as, for example, the license plate characters. *See, e.g.,* '435 Patent at 2:25-3:43.

20.    The claims of the Asserted Patent overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the Date of Invention, there were no "presently operating systems which carry out the functions and provide for the many features and advantages of the present invention [as claimed in the '435 Patent]."  *See* '435 Patent at 2:3-7.  Likewise, as of the Date of Invention, there was "substantial and significant value in being able to effectively identify, monitor and in some circumstance even control vehicle access to and exit from a secured area" in the manner as described and claimed in the '435 Patent.  *See id.* at 2:8-11.  The deficient state of the art and the non-conventionality of the claimed solution is illustrated by the express intrinsic statement of the inventor as follows: "There is nothing currently available which satisfies these needs and objectives."  *See id.* at 2: 19-20.   The inventions as

claimed overcome these deficiencies in the state of the art, and provide substantial cost savings and protections to all parties.

21. The inventions as claimed further overcome the deficiencies existing in the art as of the Date of Invention and provide substantial benefit.  The benefits of the claimed inventions are derived from the improved functionalities and usefulness of the then-existing systems and methods as provided by the claimed inventions.   By way of example, the inventions as claimed improved the functionality of then-existing systems and allowed for greater revenues and decreased overhead expenditures by facility owners.  The inventions further improved public safety by allowing for greater access control and personnel safety.  Still further, the inventions provided for more efficient roadway and parking facility entrance and exit conditions, thereby saving substantial public time, as well as reductions in traffic congestion.  Still further, the inventions as claimed allowed for greater public trust in the entities controlling toll roadways and parking areas.  Yet still further, the inventions as claimed improved functionality and reliability by reducing instances of human error in data reading and/or data entry activities.  Further, the inventions as claimed allowed for the reduction or elimination in the use of electronic transponders as a means of access control, thereby reducing reliance on system compatibility and individual elective participation.  Yet further, the inventions as claimed provided for the reduction of electronic waste from the elimination of vehicle transponders.  Yet still further, the inventions as claimed allowed for greater certainty and efficiency by issuing or offering individual tickets/tags per event.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems existing as of the Date of Invention.   Further, each of the foregoing represent non-routine and unconventional technological solutions to the deficiencies in the art as of the Date of Invention; thus, the inventions

as claimed capture inventive concepts that transform the inventions into substantially more than the mere practice of monitoring access to a location.

22.   As discussing during prosecution, the inventions as claimed are directed to non-conventional methods, including by providing a multi-tiered security scheme for managing a flow of vehicles entering and exiting a host's zone of interest.  Indeed, this multi-tiered security scheme is captured by the claims of the '435 Patent, and comprises an inventive concept and technological solution.

23.   The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing methods for controlling access using vehicle information, rather than the conventional approach of relying upon transponder data or driver personal information.

24.   The '435 Patent was examined by Primary United States Patent Examiner Benjamin C. Lee, together with Assistant Examiner Daniel Previl.  During the examination of the '435 Patent, the United States Patent Examiners searched for prior art in the following US Classifications: 340/572.1-572.9; 340/568.1; 571; 573.1; 568.7; 825.31; and 825.34.

25.   After conducting a search for prior art during the examination of the '435 Patent, the United States Patent Examiners identified and cited the following as the most relevant prior art references found during the search: (i) US 4,990,757; (ii) US 5,751,973; (iii) US 6,340,935; (iv) US 6,865,539; (v) US 6,945,303; and (vi) US 6,970,101.

26.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners allowed all of the claims of the '435 Patent to issue.  In so doing, it is presumed that Examiners Lee and Previl used their knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiners Lee and Previl had experience in the field of the invention, and that the Examiners

properly acted in accordance with a person of ordinary skill. *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002). In view of the foregoing, the claims of the '435 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art. Likewise, the claims of the '435 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiners Lee and Previl.

27.     The '435 Patent is a pioneering patent, and has been cited as relevant prior art in numerous subsequent United States Patent Applications, including Applications assigned to such technology leaders as Siemens, Amazon, and Micron.

28.     The claims of the '435 Patent were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.' Much to the contrary, a patent does have value beyond its expiration date. For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

29.     The nominal expiration date for the claims of the '435 Patent is no earlier than March 11, 2027.

## THE ACCUSED INSTRUMENTALITIES

30.     Upon information and belief, Defendant provides, owns, operates, licenses, sells, or otherwise controls the certain parking facilities and/or toll facilities, including but not limited to the infringing means and methods of ingress and egress thereto. In the alternative, Defendant makes, provides, owns, operates, licenses, sells, or otherwise controls the instrumentalities used by its

customers and/or individual users to perform the infringing steps as described herein, and thereby induces such customers and/or individual users to directly infringe.  On information and belief, such means and methods comprise a network of servers, hardware, software (including software-as-a-service, or SaaS), digital camera technologies, and mobile or web-based interfaces for managing the entering and exiting of vehicles.  On information and belief, the infringing PSA system performs the infringing steps via an interconnected system comprising means for monitoring points of access, means for obtaining vehicle information, means for offering or otherwise providing a ticket or tag, means for comparing vehicle information, and means for subjecting specific vehicles to a resolution process.  On information and belief, the infringing methods as practiced by PSA are marketed broadly as specific individual PSA Locations at varying physical addresses across six states, including Monthly Permit locations and Daily Parking locations.  Collectively, all of the foregoing comprises the "Accused Instrumentalities."





*See https://parkingsystemsofamerica.com/.*

1. Why do I have to change my old account?
   a. Because we are switching to a new system in which you no longer need a hang tag. You will simply park and we will use your License Plate Number to verify your monthly account.
2. How many cars am I allowed to have?
   a. Right now as an individual, you are allowed to add 1-2 cars to your account, however, you are able to log into your account at ANY TIME and change the License Plates any vehicles as needed. However, you can only park ONE vehicle at a time for ONE purchased permit.

*See https://parkingsystemsofamerica.com/find-parking/faqs/.*

# Citations & Towing

We have recently transitioned to a new citation processing system.

**"Parking Revenue Recovery Services, Parking Notice" (All other cities)**
**pay by phone 1-888-756-7275 or pay online at: https://prrs.paymynotice.com/**

*See https://parkingsystemsofamerica.com/parking-revenue-recovery-services-inc/.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT



*See https://prrs.paymynotice.com/.*



*See https://psasapermits.rmcpay.com/#account_start.*

---

1. Parking Permitting Services

The Permitting Services enable you to obtain and manage certain parking-related permits issued by our applicable Partners. You will be required to provide us with certain information to obtain a permit, such as the ==license plate== number of your vehicle. Permits issued through the Permitting Services are not transferable.

---

*See https://www.passportinc.com/terms-and-conditions/.*

---

The types of information that we collect are:

- **Information about you and your Passport account** – Any information that you voluntarily provide such as name, email address, phone number, password, PIN, marketing preferences, and license plate number.
- **Device information** – Operating system, browser type, IP address, device type, and device version. We collect this information automatically when you use our Services.
- **Geolocation information** – If you have enabled location services on your device we may use such services to collect the geographic location of your device when you use the Services. Some services may not function as designed if location services are disabled.
- **Vehicle information** – Insurer, vehicle registration number (VIN), registration expiration date, license plate number and state, vehicle make/model/color, and registered address.

---

*See https://www.passportinc.com/privacy-policy/.*

## COUNT I
### Infringement of U.S. Patent No. 7,525,435

31.    Plaintiff incorporates the above paragraphs by reference.

32.    Defendant has been on actual notice of the '435 Patent at least as early as the date it received service of this Original Complaint.

33.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom.

34.    Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 8 of the '435 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.  The Accused Instrumentalities themselves are specially configured to directly perform, and do in fact directly perform, all infringing steps.  In the alternative,

Defendant indirectly infringes at least Claim 8 of the '435 Patent, at least as of the date of service of this Original Complaint, by inducing others to perform the infringing acts.

35.   The Accused Instrumentalities comprise an apparatus which directly performs the claimed method for managing the entering and exiting of vehicles.  More specifically, the Accused Instrumentalities comprise a network of servers, hardware, software (including software-as-a-service, or SaaS), digital camera technologies, and mobile or web-based interfaces for managing the entering and exiting of vehicles.  On information and belief, such apparatus is installed and used in the United States, and such apparatus performs the infringing steps entirely within the United States.

36.   The Accused Instrumentalities comprise an apparatus which directly performs the step of monitoring points of access to an area so as to detect entering and exiting vehicles.  More specifically, and on information and belief, the Accused Instrumentalities comprise one or more cameras equipped with Automatic Number Plate Recognition ("ANPR") (or functionally equivalent) hardware and/or software and located at or near points of ingress and/or egress of specific areas accessible by motor vehicles (*i.e.,* parking facilities and/or roadways).  On information and belief, such Accused Instrumentalities are specially designed and programmed to monitor (and do in fact monitor) points of access and egress so as to detect entering and exiting vehicles, and to capture images thereof and derive data therefrom.

37.   The aforementioned ANPR is otherwise alternatively and variously equivalently referred to in the industry as Automatic License Plate Recognition ("ALPR"), or Car Plate Recognition ("CPR"), or License Plate Recognition ("LPR"), or Vehicle License Plate Recognition ("VLPR"), or Mobile License Plate Reader ("MLPR").  Each of these, and other generally similar names, refer generally to systems capable of electronically detecting the license plate characters of a vehicle.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                              15

38.     The Accused Instrumentalities comprise an apparatus which directly performs the step of obtaining from each said entering vehicle, entering vehicle identification information comprising at least one electronically readable unique repeatable distinguishing characteristic of said entering vehicle and storing said entering vehicle information in an information management system. More specifically, and on information and belief, the Accused Instrumentalities comprise one or more cameras equipped with Automatic Number Plate Recognition ("ANPR") (or functionally equivalent) hardware and/or software and located at or near points of ingress and/or egress of specific areas accessible by motor vehicles (*i.e.,* parking facilities and/or roadways). On information and belief, such Accused Instrumentalities are specially designed and programmed to monitor (and do in fact monitor) points of access and egress so as to detect entering and exiting vehicles, and to capture images thereof and derive data therefrom. More specifically, and on information and belief, such Accused Instrumentalities are programmed and configured such that they derive ("obtain") vehicle license plate data (an "electronically readable unique repeatable distinguishing characteristic of said entering vehicle") from incoming and exiting vehicles, including via the aforementioned ANPR or functionally equivalent technology. Further, and on information and belief, the Accused Instrumentalities are configured such that they store the derived vehicle data in a database or other electronic storage system which serves as an information management system.

39.     The Accused Instrumentalities comprise an apparatus which directly performs the step of offering said entering vehicle a security option. More specifically, and on information and belief, the Accused Instrumentalities are configured such that they assign (or pre-assign) a ticket or transaction number (or code) to each vehicle, and such code is associated with the vehicle information (the license plate data) in the aforementioned information management system. Still

further, and on information and belief, the Accused Instrumentalities are configured such that they electronically encode and form a paper or electronic ticket or receipt which incorporates at least the aforementioned ticket or transaction number.  On information and belief, such ticket or receipt is offered or otherwise provided to the driver of the vehicle (or to another individual as the agent of the vehicle) via either electronic or physical means.



See https://parkingsystemsofamerica.com/parking-revenue-recovery-services-inc/.

See https://prrs.paymynotice.com/.

40.    The Accused Instrumentalities comprise an apparatus which directly performs the step of obtaining from each said exiting vehicle, exiting vehicle identification information comprising said unique repeatable distinguishing characteristic of said exiting vehicle.  More specifically, and on information and belief, and as noted above, the Accused Instrumentalities comprise one or more cameras equipped with Automatic Number Plate Recognition ("ANPR") (or functionally equivalent) hardware and/or software and located at or near points of ingress and/or egress of

specific areas accessible by motor vehicles (*i.e.,* parking facilities and/or roadways).   On information and belief, such Accused Instrumentalities are specially designed and programmed to monitor (and do in fact monitor) points of access (including exit locations) so as to detect entering and exiting vehicles, and to capture images thereof and derive data therefrom.   More specifically, and on information and belief, such Accused Instrumentalities are programmed and configured such that they derive ("obtain") vehicle license plate data (an "electronically readable unique repeatable distinguishing characteristic of said entering vehicle") from incoming and exiting vehicles, including via the aforementioned ANPR or functionally equivalent technology.

41.   The Accused Instrumentalities comprise an apparatus which directly performs the step of comparing the respective said exiting vehicle identification information with the stored said entering vehicle identification information in said information management system for matching information whereby vehicle identification is confirmed.   More specifically, and on information and belief, and as noted above, the Accused Instrumentalities comprise an information management system which stores vehicle identification information.   On information and belief, the Accused Instrumentalities are configured such that they compare the vehicle identification information obtained from exiting vehicles with the vehicle identification information stored in a database (as obtained from entering vehicles) in order to confirm a match (or an absence of a match) between the two sets of data.

42.   The Accused Instrumentalities comprise an apparatus which directly performs the step of permitting exiting vehicles with said matching information to exit.   More specifically, and on information and belief, and as noted above, the Accused Instrumentalities are configured such that they compare the vehicle identification information obtained from exiting vehicles with the vehicle identification information stored in a database (as obtained from entering vehicles) in order to

confirm a match (or an absence of a match) between the two sets of data. On information and belief, in the event a match is confirmed, the Accused Instrumentalities are configured such that they permit vehicles with matching information to exit by fulfilling the transaction associated with the entry to the designated area and by permitting the physical exit of the vehicle.

43.   The Accused Instrumentalities comprise an apparatus which directly performs the step of subjecting exiting vehicles without said matching information to a resolution process. More specifically, and on information and belief, and as noted above, the Accused Instrumentalities are configured such that they compare the vehicle identification information obtained from exiting vehicles with the vehicle identification information stored in a database (as obtained from entering vehicles) in order to confirm a match (or an absence of a match) between the two sets of data. On information and belief, in the event a match is not confirmed, the Accused Instrumentalities are configured such that they subject such vehicles to a resolution process comprising at least the issuance of an invoice for payment and/or the detainment of the vehicle pending resolution.

44.   The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff. The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '435 Patent.

45.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '435 Patent, such infringement is necessarily willful and deliberate.

46.   On information and belief, Defendant has a policy or practice of not reviewing the patents of others. Further on information and belief, Defendant instructs its employees to not review the

patents of others for clearance or to assess infringement thereof.  As such, Defendant has been willfully blind to the patent rights of Plaintiff.

47.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Performance Partners LLC respectfully requests the Court enter judgment against Defendant as follows:

1.     Declaring that Defendant has infringed the Asserted Patent(s);

2.     Awarding PerformancePartners LLC its damages suffered because of Defendant's infringement of the Asserted Patent(s);

3.     Awarding PerformancePartners LLC its costs, reasonable attorneys' fees, expenses, and interest;

4.     Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patent(s);

5.     Awarding PerformancePartners LLC ongoing post-trial royalties for infringement of the non-expired Asserted Patent(s); and

6.     Granting PerformancePartners LLC such further relief as the Court finds appropriate.

## JURY DEMAND

PerformancePartners LLC demands trial by jury, under Fed. R. Civ. P. 38.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    20

Dated:  June 19, 2023

Respectfully Submitted

*/s/ M. Scott Fuller*
M. Scott Fuller
   Texas Bar No. 24036607
   Georgia Bar No. 100968
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   California Bar No. 239829
   rgarteiser@ghiplaw.com
Christopher A. Honea
   Texas Bar No. 24059967
   California Bar No. 232473
   chonea@ghiplaw.com


**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

**ATTORNEYS FOR PLAINTIFF**
**PERFORMANCEPARTNERS LLC**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT